## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 29 2018, 9:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Sturgeon
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>M.R. (Minor Child) and<br><br>M.R. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | March 29, 2018<br><br>Court of Appeals Case No. 10A01-1711-JT-2629<br><br>Appeal from the Clark Circuit Court<br><br>The Honorable Vicki Carmichael, Judge<br><br>The Honorable Joni L. Grayson, Magistrate<br><br>Trial Court Cause No. 10C04-1702-JT-5 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.R., Sr. (Father), appeals the termination of his parental rights to his minor child, M.R., Jr. (the Child).

We affirm.

# ISSUE

Father has raised one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of his parental rights.

# FACTS AND PROCEDURAL HISTORY

Father and M.T. (Mother)[1] are the biological parents of the Child, born on June 13, 2010. On June 15, 2010, Father established his paternity by executing a paternity affidavit. The Child has two older half-sisters (from Mother), H.T. and P.T. (Siblings).[2]

On July 24, 2013, the Clark County office of DCS received a report alleging child neglect concerning the Child and his Siblings. Specifically, it was reported that Mother and her boyfriend had taken the three-year-old Child and P.T. to the grocery store, where both Mother and the boyfriend appeared to be

---

[1] Mother's parental rights to the Child were terminated on September 29, 2017. She does not participate in this appeal.

[2] Although facts pertaining to the Siblings have been included as appropriate, Father is not their biological parent, and they are not the subject of this appeal.

intoxicated. The police were called, and Mother and the boyfriend failed breathalyzer tests. Mother admitted to having taken Xanax and Vicodin. Mother and her boyfriend were arrested for public intoxication and neglect of a dependent. DCS arrived at the Charlestown Police Station, where all three children were present due to the lack of "an appropriate, sober, drug-free caregiver." (DCS Exh. 8). At the time, Father had been incarcerated in the Clark County Jail since April 23, 2013, awaiting disposition on charges of unlawful possession of a syringe and theft, both Class D felonies, as well as a habitual offender charge. Father eventually pled guilty to the theft charge. After receiving court permission, DCS took all three children into emergency custody.

[6] On July 26, 2013, DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS) because Mother had been arrested, leaving the three children with no caregiver. That day, the trial court also held an initial and detention hearing. Although DCS initially placed the Child and his Siblings in the care of their maternal grandfather, they were later moved to separate foster homes/residential facilities. The Child has been in his present foster placement since August 1, 2014, and his foster parents intend to adopt him.

[7] On September 19, 2013, the trial court adjudicated the Child to be a CHINS. On October 24, 2013, the trial court held an initial hearing for Father, at which time he also admitted that the Child is a CHINS. Thereafter, the trial court conducted a dispositional hearing and issued a dispositional order, granting wardship of the Child to DCS. In addition, the trial court ordered Father and

Mother to cooperate with DCS's parental participation plan. Father's sole directive was to contact DCS upon his release from incarceration for a determination of services.

[8] For the majority of the case, neither parent made any substantial effort to reunite with the Child. For his part, Father spent the four years following the Child's CHINS adjudication in and out of incarceration on a plethora of charges. Specifically, between September 19, 2013, and April 21, 2017, Father was charged under five separate causes with escape and failure to return to lawful detention, a Class C felony and a Class D felony, respectively; theft as a Level 6 felony; possession of methamphetamine, unlawful possession of a syringe, and theft, all Level 6 felonies; theft as a Level 6 felony; and unlawful possession of a syringe as a Level 6 felony, possession of paraphernalia as a Class C misdemeanor, theft as a Level 6 felony, and a habitual offender charge. In every case, Father pled guilty (at least in part) and received a variety of executed and suspended sentences.

[9] Since the Child's removal, Father was incarcerated for all except "[m]aybe like eight (8) months" of the case. (Tr. Vol. II, p. 52). As he explained, "I would get locked up and I'd do like six (6) months to a year, and I would get out. So, and then it would, it was a repetitive process." (Tr. Vol. II, p. 52). Father explained that, when not incarcerated, he was homeless for a period of time and had "hit rock bottom." (Tr. Vol. II, p. 53). Nevertheless, he insisted that he "was doing everything [DCS] wanted me to do, visit[ing the Child], going to LifeSprings [for mental health treatment], going to NA." (Tr. Vol. II, p. 53).

Father stated that he briefly lived with and worked for his stepfather, but that after his stepfather kicked him out of the house, he was arrested again. Father also indicated that he repeatedly attempted to contact DCS but that his calls were ignored. Father claims to suffer from paranoid schizophrenia, post-traumatic stress disorder, depression, anxiety, a learning disorder, and a heroin addiction.

[10] Contrary to Father, DCS represented that Father did not contact DCS and never requested services. Nevertheless, DCS made several referrals for Father "just to make sure that the services were in place when he was released." (Tr. Vol. II, p. 80). Specifically, in March of 2014, DCS initiated a referral for Father to have visitation, and in July of 2014, DCS referred Father for a substance abuse assessment and home-based services. "There was about a six (6) or seven (7) week period where [a home-based services provider] attempted to provide services for [Father]." (Tr. Vol. II, p. 130). Two visitations were scheduled, neither of which Father attended despite the availability of transportation assistance. The home-based services provider also drove Father to Louisville to receive mental health treatment, but it appears that Father did not follow up. In February of 2017, after a new case manager had taken over the case, DCS sent a certified letter to Father, instructing Father to meet at a scheduled time or to otherwise contact DCS. Father neither attended the appointment or responded to the letter. DCS and service providers maintain that the Child does not know who Father is.

[11] On February 16, 2017, DCS filed a petition to terminate the parental rights of Father and Mother. On July 6, 2017, and August 3, 2017, the trial court conducted a hearing on DCS's termination petition. At the time of the hearing, Father was incarcerated with a scheduled release date of December 18, 2017. During the hearing, Father insisted that his rights should not be terminated, stating, "I feel like I'm being put in a spot where I shouldn't be, yeah. Because every bad thing that's been said in this courtroom has been against the [M]other, not me." (Tr. Vol. II, p. 206). On the other hand, DCS and the Child's court-appointed special advocate both recommended the termination of Father's parental rights. On September 29, 2017, the trial court issued Findings of Fact/Conclusions of Law and Order on Termination, terminating Father's parental rights.

[12] Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[13] Father challenges the termination of his parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute

and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* When "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment and accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.* Where, as in this case, the trial court enters special findings of fact and conclusions thereon under Indiana Trial Rule 52(A), we evaluate whether the trial court's decision is clearly erroneous. *Id.* Using this standard, we must determine "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* at 1230.

## II. *Termination of Parental Rights Statute*

In order to terminate a parent's rights to his child, DCS must prove:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
* * * *
(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate

for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[16] In ordering the termination of Father's parental rights, the trial court concluded that DCS had established each element of Indiana Code section 31-35-2-4(b)(2). On appeal, Father does not contest that the Child has been removed from the home for the requisite period of time, that termination is in the Child's best interests, or that DCS has established a satisfactory plan for the Child's care and treatment. Thus, we are left to consider whether DCS sufficiently proved the requirements of Indiana Code section 31-35-2-4(b)(2)(B)—that is, whether there is a reasonable probability either that the conditions that resulted in the Child's removal and continued placement out of the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being.[3]

### A. *Findings of Fact*

[17] Before considering whether DCS presented clear and convincing evidence to support Indiana Code section 31-35-2-4(b)(2)(B), we first address Father's claim that five of the trial court's findings of fact are not supported by the record.

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements, and in this case, DCS did not allege that the Child had twice been adjudicated a CHINS. *See In re A.K.*, 924 N.E.2d at 220-21.

## 1. *Finding #7*

> 7. A subsequent Periodic Review Hearing was held on April 17, 2014. [Mother] appeared in person; [Father] did not appear. On May 7, 2014[,] DCS filed a Motion to Modify the Dispositional Decree as to [Father], alleging he was no longer in custody and required future services. A Hearing on the Motion to Modify was held on May 22, 2014. [Father] failed to appear and the [c]ourt modified the Dispositional Order as requested.

(Appellant's App. Vol. II, p. 84). According to Father, DCS's motion to modify the dispositional order "was never granted nor ruled upon." (Appellant's Br. p. 9).

[18] The chronological case summary (CCS) supports the trial court's finding that Father failed to appear at the May 22, 2014 hearing on DCS's Motion to Modify Dispositional Decree. However, the CCS indicates that the trial court reset the modification hearing to July 17, 2014. Once again, Father failed to appear. During the second hearing, which was also a permanency hearing, the trial court "accept[ed] recommendations as outlined by DCS." (DCS Exh. Vol. III—CHINS CCS, p. 5). Although it is not explicitly clear in the CCS as to which recommendations the trial court accepted, it is reasonable, given the fact that the issue of modifying the dispositional decree was on the docket, that the trial court accepted the recommendations of DCS with respect to Father's participation in services.

[19] Nevertheless, notwithstanding whether DCS's May 7, 2014 Motion to Modify Dispositional Decree was ever officially ruled upon, there is no dispute that on

October 24, 2013, Father was directed to contact DCS for a determination of necessary services. Thereafter, DCS clearly determined that Father required specific services, which were delineated in the modification document filed with the court. In anticipation of Father's release from jail, DCS made referrals to have services in line for Father. It was incumbent upon Father to contact DCS and make an effort to establish his parental fitness in order to reunify with the Child. Moreover, even if the finding were to be stricken as being unsupported by the evidence, it does not negate the additional findings regarding Father's lack of engagement in the case.

2. *Finding #9*

> 9. Thereafter, the CHINS Court conducted regular Periodic Review and Permanency Hearings. Neither parent attended hearings on a consistent basis. Neither parent complied with the Dispositional/Participation Orders of the [c]ourt.

(Appellant's App. Vol. II, p. 84). Father contends that his only obligation pursuant to the dispositional order was to contact DCS for a determination of services, which he claims to have done. Father points to his own testimony that he "obtained a place to live with his stepfather, got employment, got mental health treatment, got an ID from the State, received a home visit by DCS, which gave its approval, and was attending Narcotics Anonymous." (Appellant's Br. p. 10).

[20] We find that Father's argument is nothing more than a request to reweigh evidence in his favor. The trial court was entitled to credit DCS's testimony

that Father did not maintain contact or otherwise make any substantial effort to participate in the services outlined by DCS for reunification. Thus, the trial court's finding is not erroneous.

### 3. *Finding #13*

> [Father] admitted to having mental and/or behavioral issues. He said he has been diagnosed with Paranoid Schizophrenia, PTSD, Depression, Anxiety and a Learning Disorder. He further testified that he has had anger and rage issues and that he "hears voices." [Father] even asked for a continuance during the July 6, 2017 hearing because he was "hearing voices." His request was granted, and the hearing resumed on August 3, 2017.

(Appellant's App. Vol. II, p. 85). Father argues that this "finding is misleading and incorrect in many ways." (Appellant's Br. p. 11). Specifically, he "did admit to having the mental health issues stated, but also testified that voices he hears do not hurt his relationship with [the Child] and that medication helps with the voices." (Appellant's Br. p. 11) (internal citation omitted). Furthermore, he asserts that he requested the continuance during the August 3, 2017 termination hearing, but that the trial court denied his request because it "was unconcerned enough by [Father's] mental health problems, issues and voices to deny the continuance, and had [Father] sit through seven (7) more witnesses and testifying himself. Using these mental health issues as a basis towards terminating [Father's] rights to his son is dubious." (Appellant's Br. p. 11).

[21]     We find nothing factually inaccurate about the trial court's restatement of Father's self-proclaimed mental health issues. This finding does not include any assessment of Father's ability to parent the Child with his mental health issues, and the trial court discussed Father's use of medication to treat his mental health in a separate finding. Furthermore, even assuming that the trial court relied on Father's unstable mental health in support of its termination decision, to now find that Father's mental health does not affect his relationship with the Child would amount to both an improper reweighing of evidence and credibility determination by this court. Father admitted during the hearing that, although his mental illness is typically regulated by medication, he also struggles to "distinguish what's real and what's fake sometimes in reality, what's really going on, what voices I'm really hearing or noises or whatever. What I'm seeing, I just, have delusions sometimes." (Tr. Vol. II, p. 210). Also, he stated that the voices in his head encourage him to harm himself and others. This evidence could very well be taken to support a finding that Father's mental health, at least to a certain extent, impacts his ability to parent the Child.

[22]     Additionally, we agree that Father requested a continuance during the second day of the termination hearing, which the trial court denied because of time constraints. By this time, the Child had been removed from the home for more than four years, and DCS's termination petition had been pending for nearly six months. Moreover, Father indicated that, despite his symptoms and hearing voices, he still understood the proceedings. As Father has not developed an

argument regarding the propriety of the trial court's denial of a continuance, we find the erroneous statements in the finding to be insignificant.

### 4. *Finding #15*

15. [Father] blamed his non-compliance with the [c]ourt's Dispositional Orders on the DCS and/or service providers. He said he had engaged in some services while incarcerated, such as [B]ible study and A.A. meetings.

(Appellant's App. Vol. II, p. 85). Father now maintains that he

never stated any beliefs about service providers. As far as his beliefs regarding DCS, as previously stated, he did contact DCS when out of custody and did receive services, until a new family case manager . . . took over his case. She admitted that . . . she took no action to provide services to him.

(Appellant's Br. p. 12).

[23] Again, we find the trial court's finding to be sufficiently supported by the record. Father's challenge is largely disguised as another request to reweigh the evidence presented by DCS establishing that referrals were initiated, Father did not engage as directed, and Father spent most of the case incarcerated. The evidence demonstrates that Father consistently refused to accept responsibility for his role in this case, even though he was admittedly never available to care for the Child or capable of doing so. Instead, he continues to rely on a mistaken assumption that DCS bears the burden of forcing parents to comply with their parental duties and participate in the lives of their children. *See In re*

*B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (noting that the termination statute "does not require [DCS] to offer services to the parent to correct the deficiencies in childcare," that termination of parental rights "may occur independently of [services], as long as the [statutory elements] are proven by clear and convincing evidence," and that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting").

### 5. *Finding #17*

> 17.  Lois Nugent [Nugent], an employee of Family Time, provided visitation supervision from 2013 to 2016.  [Mother's] visits were inconsistent and Ms. Nugent believed [Mother] was often "under the influence" during visits or home-based service visits.  She observed [Mother] falling asleep during visits; [Mother's] clothing was often inappropriate, and she had trouble providing affection for the children.  Ms. Nugent offered visits to [Father] on two separate occasions.

(Appellant's App. Vol. II, p. 86).  Father now contends that "the finding as to [his] visits with [the Child] is incomplete and misleading" because the home-based service provider—*i.e.*, Nugent—admitted that "there could have been visits where somebody else supervised" "and that she did not supervise every visit with the children." (Appellant's Br. p. 12).  Father cites his own testimony "that he did visit with [the Child] and provided a You[]Tube video of him visiting with the children at the CASI building that the [c]ourt watched." (Appellant's Br. p. 12) (internal citation and footnote omitted).  Father also argues that he sought visitation with the Child "through a Motion for Contact

Visitation." (Appellant's Br. p. 12). Thus, he contends that the trial court's "incomplete finding is intended just to put [Father] in a bad light as if he did not care about [the Child]." (Appellant's Br. p. 12).

[24] Again, we find that Father's challenge to the trial court's finding is primarily an attempt to have evidence reweighed in his favor, and the finding is sufficiently supported by the record. DCS testified that Father did not contact DCS for services, including visitation. Nonetheless, DCS initiated a referral for visitation, and Nugent attempted to secure Father's attendance at two sessions, even offering to provide transportation. Father did not avail himself of these opportunities to see the Child. Nugent did testify that there were other visitation supervisors who provided services for the family, but the evidence establishes that it was Mother who was receiving visits for the first few years of the case. Nugent added that the Child "didn't know his [Father]." (Tr. Vol. II, p. 136). Father asked the trial court to examine a video on his cell phone, and the trial court obliged. However, the video was not admitted into evidence and is therefore not before this court. No information was relayed into the record to establish what was specifically depicted in the video or to establish when the visit supposedly occurred. Nevertheless, even assuming that Father saw the Child on one occasion at some point, the Child's foster mother testified that the Child was placed in her home on August 1, 2014—*i.e.*, three years prior to the termination hearing. During that time, Father never saw or attempted to communicate with the Child. As to Father's Motion for Contact Visitation, we

note that it was not filed until June 12, 2017—*i.e.*, less than one month prior to the scheduled termination hearing.

### B. *Remediation of Conditions*

[25] We now turn to Father's claim that the trial court erroneously concluded that there is a reasonable probability either that the conditions resulting in the Child's removal and continued placement out of his custody will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being. We elect to dispose of this element via the former prong. The trial court concluded that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of the home will not be remedied based on findings that Father did not participate in the case and spent "most of the previous [three] [*sic*] years" incarcerated. (Appellant's App. Vol. II, p. 85).

[26] In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K.*, 989 N.E.2d at 1231. In making these decisions, a court "must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation and internal quotation marks omitted) (quoting

*Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. DCS need not "provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a reasonable probability that the parent's behavior will not change.'" *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

[27] First, as to the conditions necessitating the Child's removal and placement outside the home, Father argues that "[t]he original DCS action involving [the Child] did not involve [Father]." (Appellant's Br. p. 13). Rather, he cites DCS's report alleging that Mother and her boyfriend "appear[ed] at a store intoxicated with [the Child] and other children of hers and getting arrested." (Appellant's Br. p. 13). We are unpersuaded by Father's attempts to shift the blame entirely to Mother in this situation. When DCS filed its CHINS petition, it listed Father's whereabouts as "unknown," although it was later discovered that Father was incarcerated. (DCS Exh. 8). As a parent, Father is responsible for the Child's safety and well-being. Father seems to acknowledge that Mother's arrest left the Child and his Siblings "with nowhere to go," but he is

oblivious to the fact that if he had not been incarcerated, but instead had been available and appropriate to care for the Child at the time of Mother's arrest, DCS may not have proceeded with filing a CHINS action. (Appellant's Br. p. 13). *See K.E.*, 39 N.E.3d at 647 (noting that the primary condition for the child's removal as to the father was the father's "inability to provide care and supervision for [the child] due to his incarceration").

[28] Next, as to the probability that Father will remedy the conditions that resulted in the Child's removal and his continued placement in foster care, Father relies on his testimony during the termination hearing,

> without dispute from DCS, to the efforts he had made . . . . He testified that he had gotten a place to live with his stepfather and his stepfather's new wife, had employment, went for mental help [*sic*] treatment, and was going to Narcotics Anonymous. DCS even made a home visit and gave their approval to it. He obtained a state issued identification card. He has . . . taken the medication INVEGA for his schizophrenia, which helps his ability to operate in the "real world." While incarcerated, he has taken classes for his substance abuse issues and doing [B]ible studies. He has a plan for both mental health and substance abuse treatment when he is released from incarceration on December 18, 2017. He has been and is remedying any of his conditions that may have existed.

(Appellant's Br. pp. 13-14).

[29] Father's cherry-picking of evidence that casts him in a favorable light fails to convince this court that the trial court erred in its determination. Contrary to evidence presented by DCS, Father claimed that he repeatedly called DCS and

engaged in services, but Father also admitted that he "can't distinguish what's real and what's fake sometimes in reality, what's really going on" and that he has "delusions sometimes." (Tr. Vol. II, p. 210). The entirety of the evidence establishes that the Child was removed from the home for four years by the time of the termination hearing. During that time, Father had numerous opportunities to make changes in his life in order to become a fit parent. Instead, he maintained a criminal lifestyle that resulted in an ongoing cycle of incarceration throughout the case. By his own recollection, Father was released at least three times during the course of the case, but instead of working toward reunification, he chose to pursue criminal activity. *See K.T.K.*, 989 N.E.2d at 1235-36 ("Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."). Father did not take advantage of opportunities to visit the Child when he was not incarcerated. *See Lang*, 861 N.E.2d at 372 ("[T]he failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" (second alteration in original)). Even while in jail, Father admittedly never attempted to communicate with the Child by phone or letter. As of the termination hearing, Father had not seen the Child in at least three years, and the Child did not know who he was.

[30]  In addition, despite the time that had lapsed in the case, Father did not endeavor to address his substance abuse issues until shortly before the termination hearing. *See K.T.K.*, 989 N.E.2d at 1234 (noting that a trial court

has "discretion to 'disregard the efforts [a parent] made only shortly before termination and to weigh more heavily [the parent's] history of conduct prior to these efforts'"). During one of his periods of release, Father temporarily obtained employment and housing with his stepfather. Father could not maintain either, and he ultimately ended up committing additional crimes. At the time of the termination hearing, Father was unable to provide for the Child's financial and emotional needs, and there was no indication that he would be able to do so in the foreseeable future. Father suggested that the Child could live with his grandparents "until I get out," but Father did not offer a solution for living arrangements after his release. (Tr. Vol. II, p. 219). Father indicated that he had previously tried to file for disability benefits but believed it could take up to two years to be approved, and Father had no plans for employment upon his release.

[31] In sum, the Child was removed from his parents' custody because of their unavailability and inability to provide for his basic needs, and during those four years, Father failed to take any meaningful steps to meet his parental responsibilities. Accordingly, we find ample support in the record for the trial court's determination that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of the home will not be remedied.[4]

---

[4] Despite Father's claim, we also find that the trial court's findings of fact were sufficiently detailed to enable our review.

# CONCLUSION

[32] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Father's parental rights.

[33] Affirmed.

[34] May, J. and Mathias, J. concur